IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>Plaintiff,<br><br>v.<br><br>**HITLER CINTRÓN-ORTIZ**<br>Defendant. | Criminal No. 21-316 (ADC) |

**REPORT AND RECOMMENDATION**

### I.   Introduction

On September 2, 2021, Hitler Cintrón-Ortiz was charged with violations of 18 U.S.C. §922(g)(1); prohibited person in possession of ammunition. Docket No. 1. Defendant filed a motion to suppress post-arrest statements. Docket No. 40. The Government opposed. Docket No. 72. Defendant seeks suppression of post-arrest statements made after a series of interviews by law enforcement; specifically, those statements made to agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on the third interview—the second by agents of ATF.

The motion was referred to the undersigned for an evidentiary hearing and a Report and Recommendation. Docket No. 63. An evidentiary hearing was held on February 8, 2023. See Docket No. 85. The Government called Puerto Rico Police Officer Frankie Torres-Serrano and ATF Special Agent Julio Torres ("Agent Torres"). The defense called San Juan Municipal Police Officer Verónica Rodríguez-Bultrón ("Rodríguez-Bultrón"). Evidence was admitted. Arguments were heard on February 16, 2023. After carefully considering the evidence, the Court recommends that Defendant's motion to suppress be **GRANTED**.

### II.   Factual Background

The following account is drawn from the evidence, testimonial and documentary, received at the suppression hearing.

Defendant was arrested on April 11, 2019, at approximately 8:45 a.m. Transcript of Evidentiary Hearing on February 8, 2022 ("TR") at 12 ¶¶ 14-16, 13 ¶¶ 1-8. Miranda warnings

USA v. Cintrón-Ortiz
Criminal No. 21-316 (ADC)
Report and Recommendation

(specifically, as to Defendant's right to remain silent) were verbally given to Defendant at arrest. TR 13 ¶¶ 16-19, TR 19 ¶¶ 1-5, TR 20 ¶¶ 19-20. Defendant was interviewed on four different occasions by different law enforcement officers on the same day. Government Exhibits 1 and 1-A. During all four interviews the Defendant had both hands and ankles shackled. Government Exhibit 1. The first interview was with agents of ATF, the second with a San Juan Municipal Police Officer, the third with agents of ATF again, and the fourth with agents of the Homicide Unit of the Puerto Rico Police Bureau. Id. The four interviews took place between 11:05 a.m. and 2:07 p.m., lasting approximately three hours in total. All interviews were recorded. Government Exhibit 1.

The first interview began at 11:05 a.m. and ended at 11:48 a.m. Present were at least three (3) ATF agents, including Agent Torres, ATF Special Agent Raúl Peña ("Agent Peña"), and ATF Task Force Officer Héctor M. González ("TFO González"). TR 28 ¶¶ 13-20. TFO González read the Defendant his rights under Miranda, the Defendant placed his initials next to each one of the rights certifying that he understood the rights and agreed to speak to law enforcement. TR 30 ¶¶ 1-4; Government Exhibit 1-A at 18-20.[1] The Defendant provided statements to ATF. At no point did the Defendant request to stop the interview or that he be provided an opportunity to speak to an attorney. TR 31 ¶¶ 8-13.

The second interview began at 11:55 a.m. and ended at 12:13 p.m. Present were San Juan Municipal Police Officer Rodríguez-Bultrón (then assigned to CIC San Juan Homicide) and TFO González. TR 32 ¶¶ 1-23. During that interview, the Defendant was presented with a Miranda Waiver form of the Puerto Rico Police Bureau (the "PRPD Miranda Form"). Defendant Exhibit A. That form listed the following description of rights: (1) You have the right to remain silent and refuse to answer questions. (2) Anything you say can be used against you in a court of law. (3) You have the right to consult with an attorney before speaking to a member of the police and the right to have an attorney present while you are interrogated now or are being interrogated in the future. (4) If you cannot afford to hire an attorney and want one, the state will provide one prior to

---

[1] Although it appears from the video recording of the interview that Defendant was given and signed a form with the Miranda warnings (see also TR 43 ¶¶ 19-25), that form was not introduced in evidence. Nonetheless, at least at this juncture, Defendant is not challenging that the form was signed by the Defendant in the manner described during the hearing; waiving his rights under Miranda. And in any event, per arguments made by counsel for the defense, Defendant is not seeking to suppress statements made during the first interview but only any incriminating statements made after the signing of the Miranda form in the second interview and specifically those made to agents of ATF during the third interview.

interrogation. (5) If you decide to answer now without the presence of an attorney, you will always have the right to halt the interrogation until you speak to one. (6) Knowing and understanding these rights after having explained them to you, do you wish to answer the questions without the presence of an attorney? Rodríguez-Bultrón read and explained the form to the Defendant. TR 61 ¶¶ 21-24; Government Exhibit 1-A at 84-87, Government Exhibit 1 at 11:56:08 a.m., Defendant Exhibit A. The Defendant told Rodríguez-Bultrón that he would answer what he wanted ("I will answer what I want."). TR 84 ¶ 3; Government Exhibit 1-A at 86, Government Exhibit 1 at 11:57:08 a.m. The Defendant placed his initials next to each one of the listed rights. The Defendant did not answer the last item on the list— whether he wished to answer questions without the presence of counsel. The form provided instructions for "Suspect's Statement on their Consent to Interrogation", requiring that the Defendant mark one of the options with an X. The Defendant marked: "I understand the rights that these warnings confer me, and I have decided to **NOT waive** them.". Defendant Exhibit A (emphasis in the original). The Defendant marked the option that was suggested by Rodríguez-Bultrón. TR 64 ¶¶ 19-20; Government Exhibit 1-A at 87-88. The Defendant signed the form on April 11, 2019, at 11:58 a.m. Defendant Exhibit A. The form was also signed by Rodríguez-Bultrón and TFO González. Id. The Defendant answered some questions by Rodríguez-Bultrón, including that he knew the victim of the murder under investigation and that he could not say who participated in the murder. Government Exhibit 1-A at 93-96. He refused to answer other questions relating to the murder investigation. The following is the relevant excerpt of the interview:

[…]
Rodríguez-Bultrón:   Do you want to…tell me if it was really like that, do you want to keep on, on …?
Defendant:   (He shook his head no.)
Rodríguez-Bultrón:   You're not going to answer me?
Defendant:   (He shook his head no.)
Rodríguez-Bultrón:   Well, I'll say it again, I'm going to…
Defendant:   Uh-huh.
Rodríguez-Bultrón:   You have the right. You're not going to talk to me about him?
Defendant:   (He shook his head no.)
Rodríguez-Bultrón:   And about the other person who participated either?
Defendant:   "Who participated"? I can't tell you if that person participated.
Rodríguez-Bultrón:   I am going to look for a […] you have rights. If you want to talk to me and your contribution at any given time in the case […].
Defendant:   (He shook his head no.)

| | |
|---|---|
| Rodríguez-Bultrón: | I am going to look for a … let me see, that I have another file (unintelligible). As you can see, I have my evidence, that (Unintelligible) all the investigation that I conducted. (Unintelligible) you have rights. If you want to talk to me and your contribution at any time in the case regarding, when certain …what the … what the judge determines, it could also be argued that you helped and "colla" […] and you collaborated with the investigation. |
| Defendant: | (He shook his head no.) |
| Rodríguez-Bultrón: | Well, so, look, I'm going to, to write this last thing that, well, that I talked to you about and, well, my questions would end here. But I did approach you. I came in good faith to question you. |
| Defendant: | Uh-huh. |
| Rodríguez-Bultrón: | To do the, right? … It's up to you to decide. Okay. I'm going to write that you exercised your right not to answer and you decided not to (unintelligible). |
| Defendant: | Uh-huh. |
| […] | |
| Rodríguez-Bultrón: | Do you agree with what I wrote? |
| Defendant: | Yes. |

Government Exhibit 1-A at 95-99, Government Exhibit 1 at 12:10:37 p.m.

The third interview began at 1:04 p.m. and ended at 1:46 p.m. Present were at least four (4) ATF Agents, including Agent Torres and Agent Peña. TR 34 ¶¶ 11-15. TFO González was not present during that interview. TR 34 ¶¶ 16-19. Defendant was not given warnings under Miranda at that time. TR 33 ¶¶ 8-11. Agent Peña, who conducted the interview, implied having knowledge that Defendant had refused to talk to Rodríguez-Bultrón and expressed that he would not be asking questions. The following are relevant excerpts of that interview:

| | |
|---|---|
| Agent Peña: | I know that my colleague who came before…I'm not asking you questions because I know that … that… perhaps you declined to talk to her […]. |
| | […] |
| Agent Peña: | I'm not asking you questions, let me make that clear. |
| | […] |
| Agent Peña: | And, like I said, I haven't asked you any questions. […] |
| | […] |

Government Exhibit 1-A at 107, 110, Government Exhibit 1 at 1:04:26 p.m.

During the first part of the third interview, Defendant was shown a video of the murder. Government Exhibit 1-A at 107-111. Defendant did not provide any incriminating statements at that time. Defendant stood up to leave apparently believing the interview to have concluded. Id. at 112, Government Exhibit 1 at 1:10:07 p.m. He was instructed to take a seat. Id. Later during the

4

third interview, Defendant provided incriminating statements to ATF. He did not request that the interview stop or that he be provided an opportunity to speak to an attorney. TR 34 ¶¶ 20-25, TR 35 ¶ 1. The fourth interview began at 1:48 p.m. and ended at 2:07 p.m. Present were PRPB officers of the Homicide Unit in Bayamón. TR 35 ¶¶ 4-7.

### III.    Applicable Law and Analysis

Defendant seeks suppression of statements made after the second interview, when he signed the PRPD Miranda Form at Defendant Exhibit A (marking: "I understand the rights that these warning confer me, and I have decided to **NOT waive** them.") after being informed of his rights under Miranda by Rodríguez-Bultrón. Defendant Exhibit A (emphasis in the original)). Defendant argues that in signing that form he chose to invoke both his right to remain silent and his right to counsel. And that all interrogation should have ceased. Alternatively, Defendant argues that the third interview was a violation of Defendant's rights under the Fifth Amendment as he was not re-advised of his rights after having invoked his right to silence during the second interview. The Government argues that Defendant's statements to ATF were voluntary. The Government further argues that Defendant never invoked his right to counsel and that his decision to reject a waiver of rights in the PRPD Miranda Form was the consequence of mistaken instructions provided by Rodríguez-Bultrón. The Government also posits that the Defendant did not invoke his right to remain silent, agreeing instead to answer some questions posed by Rodríguez-Bultrón. And that, in any event, any invocation of the right to remain silent was scrupulously honored by law enforcement.

Pursuant to the Fifth Amendment of the U.S. Constitution, no person "shall be compelled in any criminal case to be a witness against himself". U.S. Const. amend. V. Premised on this constitutional right, in Miranda v. Arizona, 384 U.S. 436, 444 (1966), the U.S. Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." United States v. Lugo Guerrero, 2005 WL 8163207 *6 (D.P.R.). The procedural safeguards under Miranda require that the suspect be adequately and effectively appraised of his rights, and that the exercise of those rights be honored by law enforcement. Missouri v. Seibert, 542 U.S. 600, 608 (2004). Therefore, the Fifth Amendment privilege against self-incrimination requires that, prior to questioning a

5

suspect, the police appraise the suspect of his right to remain silent and to have counsel present during questioning, and of the state's intention to use his statements to secure a conviction. Moran v. Burbine, 475 U.S. 412, 420 (1986) (discussing Miranda v. Arizona, 384 U.S. at 468-470, 473-474). To be sure, Miranda not only requires that the suspect be informed of his rights but that police respect the suspect's decision to exercise any such rights and cease questioning immediately upon the assertion of rights. Id.; Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

After a suspect has been appraised of his rights under the Fifth Amendment, the prosecution may proceed to interrogate the suspect only if he has not invoked his right to counsel or his right to remain silent. Once a suspect has expressed a desire to have counsel present during interrogation, law enforcement is prohibited from interrogating the suspect until counsel has been made available. Id. As it pertains to the right to counsel, the rule allows only one exception— when the suspect (without coercion or probing) initiates further communication, exchange or conversation with law enforcement. Id.; United States v. Carpentino, 948 F.3d 10, 20-22 (1st Cir. 2020); Arizona v. Roberson, 486 U.S. 675, 687-688 (1988) (requirement that interrogation ceases after invocation of right to counsel applies even when the reinterrogation concerns a different offense and when different law enforcement authorities are involved in the reinterrogation). For a suspect to properly invoke his right to counsel, he must do so unambiguously and unequivocally. Davis v. United States, 512 U.S. 452, 458-459 (1994). The inquiry is an objective one—that a reasonable officer under the circumstances would understand the suspect's request as one for counsel. Id. Although the U.S. Supreme Court in Davis declined to adopt a rule requiring clarifying questions by law enforcement when a suspect's request is unclear, the U.S. Supreme Court did note that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney". Id. at 461. The First Circuit in Oquendo-Rivas discussed this "good police practice" with approval. United States v. Oquendo-Rivas, 750 F.3d 12, 19 (1st Cir. 2014).

Defendant asserts that he invoked his right to counsel by marking the "**NOT waive**" line in the PRPD Miranda Form. Without context, this argument could potentially carry the day. The problem lies in the manner that Defendant expressed his desire not to waive and his conduct following the signing of the form. The Government argues that, rather than rejecting the waiver of rights, Defendant agreed to be interviewed by Rodríguez-Bultrón by stating that he would

6

selectively answer the questions posed, and that the only reason that Defendant marked the "**NOT waive**" line in the PRPD Miranda Form was because he was so instructed by Rodríguez-Bultrón. Consequently, the Government argues, the Defendant failed to make an unequivocal and unambiguous invocation of his right to counsel. The Court agrees with the Government that Defendant's statement that he would selectively answer the questions by Rodríguez-Bultrón is inconsistent with an unequivocal unwillingness to answer questions without the presence of counsel. The Court also agrees that, as it is evident from the recording of the interview, the Defendant did follow the suggestions of Rodríguez-Bultrón in marking the "**NOT waive**" line in the PRPD Miranda Form. Under those circumstances (at that point in the interview) a reasonable officer could have understood that Defendant was willing to answer questions without the presence of counsel and not known to bring the interrogation to a halt. But the Court's inquiry does not end there. Defendant argues that, in any event, he did invoke his right to remain silent and that his invocation was not "scrupulously honored" by ATF. On this, we agree.

To invoke the right to remain silent, an accused must do so unambiguously. Berghuis v. Thompkins, 560 U.S. 370, 381 (2010). Merely remaining silent is insufficient. Id. at 382. Furthermore, expressing not having anything to say—without an outright denial of the invitation to answer questions—may be interpreted as a protest of innocence rather than as an invocation of the right to remain silent. United States v. Simpkins, 978 F.3d 1, 12 (1st Cir. 2020). When a suspect invokes his right to remain silent, law enforcement is not automatically forbidden from resuming interrogation. United States v. Andrade, 135 F.3d 104, 107 (1st Cir. 1998); United States v. Oquendo-Rivas, 750 F.3d at 17. Interrogation may resume only if the defendant's right to cut off questioning is "scrupulously honored". Michigan v. Mosley, 423 U.S. 96, 104 (1975). Four factors are relevant to this analysis: (1) whether a significant amount of time lapses between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of Miranda warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect. United States v. Lugo Guerrero, 524 F.3d 5, 12 (1st Cir. 2008) (citations omitted). Other factors include the scope of the second interrogation and the intensity with which the officers pursued questioning after the suspect asserted the right to silence.

United States v. Barone, 968 F.2d 1378, 1384 (1st Cir. 1992) (discussing Mosley, 423 U.S. at 104-105). Court's look at the totality of the circumstances in assessing the Mosley factors. United States v. Lugo Guerrero, 524 F.3d at 12 (citations omitted). The burden rests with the Government. United States v. Barone, 968 F.2d at 1384 (citing Miranda, 384 U.S. at 475-76).

An analysis of the video recording of the interview with Rodríguez-Bultrón (and the transcript provided by the Government) leads the Court to conclude that Defendant did invoke his right to remain silent. Rodríguez-Bultrón initiated that interview by reading the Defendant his rights under Miranda. Government Exhibit 1-A at 84-85. The Defendant informed Rodríguez-Bultrón that he would answer what he wanted. Id. at 86. Rodríguez-Bultrón suggested to the Defendant that he mark the "**NOT waived**" line in the PRPD Miranda Form. Id. at 87. He did. Id. Rodríguez-Bultrón informed the Defendant of the nature of her investigation; a murder that occurred on October 3, 2018. Id. at 88. The Defendant proceeded to answer some questions, including that he knew the victim of the murder under investigation. Id. at 93-95. However, when Rodríguez-Bultrón further explained why she was there, that charges against the Defendant were forthcoming, and that the Defendant had been identified as a suspect, Defendant drastically changed course. Id. at 95. In response to Rodríguez-Bultrón's question as to whether he wanted to keep on ("do you want to keep on, on …?"), the Defendant shook his head in the negative. Id. at 96. When asked if he was going to answer ("You're not going to answer me?"), the Defendant again shook his head in the negative. Id. When asked if he was going to talk to Rodríguez-Bultrón about the victim ("You're not going to talk to me about him?"), the Defendant again shook his head in the negative. Id. When asked if he was to cooperate ("If you want to talk to me and your contribution at any given time in the case"), the Defendant again shook his head no. Id. at 97. At that point, Rodríguez-Bultrón halted the interview ("my questions would end here") and expressed that she would note that Defendant had "exercised [his] right not to answer". Id. The Defendant agreed with her notes. Id. at 99. Significantly, in the video recording of the interview, there is no indication whatsoever that Rodríguez Bultrón, TFO González or the Defendant were confused as to what was transpiring or that there had been any miscommunication between Rodríguez-Bultrón and the Defendant. All the persons present during that second interview were on the same page—the interview concluded when the Defendant communicated—albeit not verbally—that he was

unwilling to continue the interrogation or to cooperate. The non-verbal cues of the Defendant (shaking his head in the negative on multiple occasions) were unambiguous.

The Government cites to Thompkins and Simpkins in support of its contention that no such invocation occurred. The defendant in Thompkins, who had refused to sign the waiver of rights, was interviewed for several hours. During the interview, he remained largely silent. He neither answered nor declined to answer. After several hours the defendant in Thompkins broke his silence to make the incriminating statements. See Thompkins, 560 U.S. at 374-376. The Defendant here was not merely silent. He expressly declined to answer questions. He did so by saying no with his head; not verbally. But shaking his head in the negative on several occasions to the questions by Rodríguez-Bultrón (i.e., whether he wanted to keep on speaking, answer her questions regarding the victim, talk to her or cooperate) is not the same as remaining silent. The Defendant's rejection to the invitation to speak and his unequivocal refusal to speak by shaking his head in the negative can be easily appreciated in the video of the interview.

The facts of this case are also different to those in Simpkins. The defendant in Simpkins used the phrase "nothing to say" to answer questions by law enforcement. The First Circuit deemed that, in the circumstances of that case, such a phrase was a convenient means of the defendant denying that he possessed any guilty knowledge of the crime under investigation. Simpkins, 978 F.3d at 12. The Defendant here refused to answer questions by shaking his head; affirmatively answering no to Rodríguez-Bultrón's question as to whether he would continue to talk to her or cooperate. And while at one point the Defendant did engage and said that he could not identify who might have participated in the murder (arguably, a denial of knowledge under Simpkins[2]), that statement should not be viewed in a vacuum. Before and, more importantly, after such a statement, the Defendant in no uncertain terms informed Rodríguez-Bultrón that he would not be answering questions. Indeed, the Defendant said NO with his head on four (4) occasions. Rodríguez-Bultrón ended the interview precisely because the Defendant refused to answer questions and, because, as expressed by her, the Defendant had "exercised [his] right not to answer". Government Exhibit 1-A at 97. The U.S. Supreme Court in Thompkins noted that if,

---

[2] Rodríguez-Bultrón:   And about the other person who participated either?
Defendant:   "Who participated"? I can't tell you if that person participated.
Government Exhibit 1-A at 96.

rather than merely remaining silent, the defendant would have said that he wanted to remain silent or that he did not want to answer, he would have effectively invoked his right to remain silent. Berghuis v. Thompkins, 560 U.S. at 382. The Court is of the view that by answering no with his head on several occasions (shaking his head in the negative) to the questions posed by Rodríguez-Bultrón the Defendant did express that he did not want to answer. He affirmatively (and in the Court's view, effectively) communicated his decision to remain silent. No more was required. See Michigan v. Mosley, 423 U.S. at 100 ("If the individual indicates **in any manner**, **at any time prior to or during questioning**, that he wishes to remain silent, the interrogation must cease") (quoting Miranda, 384 U.S. at 473-474) (emphasis added). A reasonable officer in that second interview would have understood that Defendant was invoking his right to remain silent. The video recording of the interview strongly suggests that this is also what Rodríguez-Bultrón understood that day.[3]

      A word on the PRPD Miranda Form signed by Defendant rejecting waiver. As discussed, the Court is willing to conclude that, given the circumstances surrounding Defendant's signature of the PRPD Miranda Form rejecting waiver and the Defendant's actions and statements immediately following the signing of the PRPD Miranda Form, the form alone was insufficient to unambiguously communicate Defendant's decision to invoke his rights to counsel and to remain silent. However, this is not to say that the PRPD Miranda Form in which Defendant selected not to waive his rights under Miranda should be disregarded by the Court. The fact that the Defendant may have followed the suggestion of Rodríguez-Bultrón in expressing his decision not to waive his rights under Miranda, does not necessarily mean that the Defendant did not intend to reject the waiver. Defendant's rejection of Rodríguez-Bultrón's requests for answers to questions at the end of the second interview coupled with Defendant's rejection of the waiver in the PRPD Miranda Form is a clear indication of the Defendant's decision to invoke his right to remain silent. See

---

[3] Rodríguez-Bultrón testified that she did not intend to write that Defendant invoked his right to remain silent. TR 97 at ¶¶ 17-24. And the Government has argued that Rodríguez-Bultrón ended the interview because she was not getting anywhere with the interrogation. But considering Rodríguez-Bultrón's expressions and actions during that part of the video, the Court is not convinced. Rodríguez-Bultrón did not appear confused or doubtful. On the contrary, a review of that portion of the video shows that Rodríguez-Bultrón clearly understood Defendant's non-verbal communication and his refusal to answer additional questions or to cooperate. Government Exhibit 1. The Court does not credit Rodríguez-Bultrón's testimony that she understood or intended otherwise.

United States v. Soler-Muñiz, Criminal No. 19-247 at Docket No. 59 at 2, 6-7 (defendant there filled out the same PRPD Miranda Form in the same manner as Defendant here—initials next to rights and checked the box rejecting waiver (also failing to answer the last question on the form—"are you willing to answer my questions without an attorney present"); Court found that the defendant's negative assertion of the decision not to waive does not *without more* create ambiguity as to defendant's assertion of right to counsel).

Now to Mosley. Did ATF agents "scrupulously honor" Defendant's invocation of the right to remain silent in the third interview? The first factor is whether there was a significant span of time between the suspect's invocation of the right to remain silent and further questioning. Rodríguez-Bultrón's interview of the Defendant concluded at 12:13 p.m. and the third interview began at 1:04 p.m. That is a 51-minute lapse before reinterrogation. In United States v. Oquendo-Rivas, 750 F.3d at 18, the First Circuit noted than a 20-minute passage of time was significantly shorter than the period found reasonable under Mosley (more than 2 hours). Id. But rejected the idea that Mosley purported to set a floor. Id. Although, ultimately, the First Circuit found that 20 minutes was not unreasonably short to merit a finding of a Miranda violation, the First Circuit warned: "[t]his holding should not be read in any way to imply our acceptance of police practices that give suspects only a momentary respite after their refusal to make a statement. […] that determination is fact specific." Id. The First Circuit in Oquendo-Rivas expressed that there could be serious concerns when reinterrogation resumes only 20 minutes after the initial invocation of the right to remain silent. Id. Against this backdrop, the Court concludes that the 51-minute lapse after the assertion of rights in this case is not *per se* unreasonable. However, there is no question that this is significantly shorter than the span found reasonable by the U.S. Supreme Court and the First Circuit in other cases. See e.g., Michigan v. Mosley, 423 U.S. at 104-05 (2 hours); United States v. Lugo Guerrero, 524 F.3d at 12 (4 hours); United States v. Andrade, 135 F.3d at 107 (4 hours); Grant v. Warden, Maine State Prison, 616 F.3d 72, 77–78 (1st Cir. 2010) (19 hours).

The next factor is whether the same officer conducted the interrogation where the suspect invoked the right to remain silent and the subsequent interrogation. The officer that conducted the second interview was a Municipal police officer and the officer that conducted the third interview was an agent of ATF. An important caveat though. TFO González, an ATF agent, was present during the second interview, when Rodríguez-Bultrón read the Defendant the PRPD Miranda Form

11

and obtained his initials and signature. He was also present when the Defendant opted to mark the "**NOT waive**" portion of the PRPD Miranda Form in that interview.[4] He also signed the PRPD Miranda Form at Defendant Exhibit A. And, most importantly, TFO González was present when the Defendant asserted his right to remain silent leading to the conclusion of the second interview.[5] Whether TFO González informed other ATF agents of the Defendant's invocation of the right to remain silent in the second interview is unclear. But under these circumstances the Court is not willing to conclude that ATF agents had no notice of what had transpired during the second interview.

Indeed, although Agent Torres denied having knowledge of conversations between Rodríguez-Bultrón and agents of ATF, or between TFO González and other agents of ATF, prior to the third interview (see TR 33 ¶¶ 18-21, TR 40 ¶¶ 22-25, TR 41 ¶¶ 1-10), it is evident that Agent Peña, who conducted the third interview, had some knowledge that Defendant had declined to answer questions by Rodríguez-Bultrón. And that he may have been barred from asking questions. See Government Exhibit 1-A at 107, 110 (Agent Peña implying that Defendant had declined to speak, and that no questions should be posed). The Government's argument that Agent Peña's use of the word "perhaps" indicates that ATF did not have knowledge of Defendant's decision to decline to speak to Rodríguez-Bultrón is unpersuasive. Agent Peña's expressions can only be explained if he had some knowledge that Defendant had refused to speak during the second interview. The Government cannot take cover under the use of the word "perhaps", especially when Agent Peña chose not re-advise Defendant of his Miranda rights or to clarify any lingering doubts he may have had. See e.g., Davis v. United States, 512 U.S. at 461; United States v. Oquendo-Rivas, 750 F.3d at 19 (discussing good police practice).[6] Under these circumstances, this factor weighs against the Government.

---

[4] TFO González took a phone call during that portion of the second interview and is out of the camera lens for a few seconds. Nonetheless, he remained in the interview room with the door open. See Government Exhibit 1 at 11:59:11 a.m.

[5] TFO González was also the ATF agent who obtained Defendant's signature to the waiver during the first interview by ATF.

[6] See LaFave, Israel, King and Kerr, 2 Criminal Procedure at § 6.9(e) (4th ed. 2015) ("[T]here is much to be said for the view that the police are under an obligation to clear up misunderstandings of this nature which are apparent to any reasonable observer. Short of this, it certainly makes sense in such cases

This brings us to the last two factors. Whether the ATF agents in the third interview gave the Defendant a fresh set of Miranda warnings prior to reinterrogation. Clearly, they did not. TR at 33. See United States v. Rosario-Cintrón, 194 F.Supp. 3d 161, 176 (D.P.R. 2016) (no refreshed Miranda warnings; Miranda violation at reinterrogation). Compare Michigan v. Mosley, 423 U.S. at 104-105 (Miranda warnings repeated prior to reinterrogation); United States v. Oquendo-Rivas, 750 F.3d at 18 (same); United States v. Lugo Guerrero, 524 F.3d at 12 (same); United States v. Andrade, 135 F.3d 106 (law enforcement confirmed that defendant remembered Miranda rights read earlier); United States v. Thongsophaporn, 503 F.3d 51, 56 (1st Cir. 2007) (second Miranda warning prior to subsequent interrogation); Grant v. Warden, 616 F.3d at 78 (full new set of Miranda warnings). There is also no question that the subsequent interrogation of the Defendant concerned the same crime as the one under discussion during the second interview. Both the second and third interview were aimed at obtaining statements and cooperation by Defendant with respect to the murder under investigation. See TR 30 ¶¶ 9-14, TR 33 ¶¶ 1-7 (Government Exhibit 1-A at 107-109) and TR 53 ¶¶ 16-24 (Government Exhibit 1-A at 88). See United States v. Rosario-Cintrón, 194 F.Supp. 3d at 176 (same crime; Miranda violation at reinterrogation); Compare Michigan v. Mosley, 423 U.S. at 104-105. Both factors weigh in favor of suppression.

That Defendant's statements in the third interview *may* have been voluntary is insufficient to change the outcome. In United States v. Barone, the First Circuit affirmed the District Court's suppression of defendant's incriminating statements. One of the issues on appeal was that the District Court had deemed the incriminating statements to have been voluntary but opted to suppress under Mosley. United States v. Barone, 968 F.2d at 1382. The First Circuit distinguished between the voluntariness test to determine whether there has been a valid waiver of Miranda rights (where the suspect's state of mind is central) and the Mosley test, which requires focus on the conduct of law enforcement. Id. at 1384. The First Circuit explained that under Miranda and Mosley "a court need determine specifically whether there has been a voluntary waiver only after the government has carried its burden of showing that it complied with the required procedures". Id. If the court finds that law enforcement failed to honor a defendant's invocation of his right to

---

to conclude that the defendant's conduct should significantly increase the prosecution's burden to overcome the presumption against waiver of *Miranda* rights.").

silence, there is no need to make a finding as to the voluntariness of the defendant's statements. Id. ("[T]he voluntariness finding was unnecessary and, indeed, irrelevant.").

The Government has not established that ATF agents scrupulously honored Defendant's invocation of his right to remain silent. Defendant invoked his right to remain silent and the second interview concluded. ATF agents initiated the third interview with the knowledge that Defendant had invoked his right to remain silent. They chose to carry on with the reinterrogation without giving the Defendant new Miranda warnings. That was the third interview of the day pertaining to the same murder investigation. At the beginning of the third interview, after being shown the video of the murder, ATF did not obtain any incriminating statements. The Defendant stood up to leave apparently believing the interview to have concluded. The Defendant was told to take a seat and the interview proceeded. Again, no Miranda warnings were imparted. The Defendant then made incriminating statements. Under the totality of the circumstances, it is the Court's view that Defendant's right to cut off questioning was not scrupulously honored. See Id. at 1384-1386 (finding violation; considering failure to repeat warnings and number of encounters aimed at eliciting cooperation as to the same crime); United States v. Rosario-Cintrón, 194 F.Supp. 3d at 176.

### IV.   Conclusion

For the reasons discussed above, the Court recommends that Defendant's motion to suppress at Docket No. 40 be **GRANTED**, and that any incriminating statements elicited after Defendant's invocation of his right to remain silent in the second interview be suppressed.

**IT IS SO RECOMMENDED.**

This Report and Recommendation is issued pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed within fourteen (14) days of its receipt. Failure to file timely and specific objections to the Report and Recommendation is a waiver of the right to review by the District Judge and of appellate review. Thomas v. Arn, 474 U.S. 140, 154-155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992).

In San Juan, Puerto Rico, this 30th day of May 2023.

s/Giselle López-Soler
GISELLE LÓPEZ-SOLER
United States Magistrate Judge